ERVIN, Chief Justice.
We review an order of the Florida Industrial Commission reversing an order of the Judge of Industrial Claims in this case.
In order to reflect the factual situation involved herein,' it is necessary to set forth the same at some length, as follows:
Claimant, Mrs. Jocquelyn H. Shunk, testified she has a real estate license; that *270 her employment with Gulf American Land Corporation was to find prospective lot purchasers and to solicit them to travel in a plane provided by employer from the points where the prospects were assembled and emplaned to her employer’s real estate development near Naples, Florida.
In Daytona Beach, Florida, claimant solicited one Luther Carrol Tanly, with the knowledge of her immediate supervisor, Howard Keller, to make the plane trip. In the course of persuading Tanly to make the trip, Mrs.' Shunk had dinner with Tanly and Keller and a Mrs. Catherine W. Morris, her fellow employee. After a late dinner (completed about 12:30 A.M.) the night of the claimant’s accident, according to claimant’s version of the affair, she accompanied Tanly to the Ritz Apartments in Daytona Beach where he was stopping. She said she went to his apartment for the purpose of ascertaining where he stayed so that she could awaken him in time the next morning to see that he got on board the plane along with other prospective customers for the trip to Naples.
It is uncontradicted that it was her duty to assist in seeing that sufficient prospective customers, necessary to fill the required quota for a plane load, were on board in time for scheduled flights to Naples. In this instance, the plane was scheduled to depart from the airport at Daytona Beach at 7:00 A.M., with Tanly included in the quota leaving on the plane that morning.
Claimant testified that upon arriving at the Ritz Apartments she had an altercation with Tanly; that he made improper advances toward her; that in attempting to elude him, she fell 25 feet from a window of the apartment building, injuring herself. The injury occurred at about 2:30 A. M.
Mrs. Shunk testified she had only had two cocktails, one before dinner and one afterwards; that she became nauseated after eating shrimp at the dinner, and that upon arriving at Tanly’s apartment she asked him if she could use his bathroom to relieve her nausea. She testified that upon leaving the bathroom and attempting to leave the apartment Tanly’s advances and the altercation ensued.
Her unusual hours of employment, sometimes lasting into the early morning hours, and the method of soliciting prospects for plane trips and land sales, were corroborated by the testimony of Mrs. Morris.
Other witnesses corroborated Mrs. Shunk’s unusual working hours and methods of solicitation which were required by Gulf American Land Corporation.
Mrs. Morris, who was with Mrs. Shunk all evening until Mrs. Shunk went with the prospect Tanly to his apartment to get his room number, testified Mrs. Shunk told her where she was going and that she would be right back. She testified they had stopped after the dinner for a time at the headquarters of the sales unit for the employer at the San Marino Motel in Day-tona Beach. She also testified that neither she nor Mrs. Shunk were drunk and reiterated that Mrs. Shunk was not drunk when she left to accompany Tanly to ascertain his room number. She also testified they had been working hard all evening before the accident, soliciting prospects, and had not been “out on the town” or “drinking.”
Tanly was ordered to give his deposition, but did not do so. The only version of the affair from Tanly was what Daytona Beach Police Officer Richard F. Browne testified Tanly had told him about the accident the night it occurred, when he took Tanly into custody on suspicion of attempted homicide. Officer Browne testified Tanly had told him that he and Mrs. Shunk had been drinking at a list of bars. Tanly was booked for vagrancy, but not actually charged with anything and was released the same day of his arrest.
Officer Freían Lee Patrick gave a statement about finding Mrs. Shunk where she had fallen and stated that he smelled liquor of some kind on her breath.
In a statement made at the hospital just after the accident (but later contradicted *271 at the hearing on the claim) claimant said she was accosted in a telephone booth by .a short white male with a gun who took her to his apartment from which she jumped.
Mr. Howard Keller, the immediate supervisor of the claimant, testified by deposition that the duties of the solicitors employed by Gulf American Land Corporation included the following: Finding prospects anywhere, any time, any place they could do so (including restaurants, beaches, motels); obtaining from the prospects their hotel or motel room numbers, telephone numbers, and the responsibility for getting the prospects up early in the mornings to catch the 7:00 A. M. plane for the real estate development located near Naples. Mr. Keller stated in this case it was definitely Mrs. Shunk’s responsibility and a part of her job to get Mr. Tanly on the plane the morning following the dinner. He testified that to the best of his knowledge all of them, including Mrs. Shunk, were sober when they returned to the San Marina Motel (headquarters of the prospect solicitors) from the late dinner, conversation, cocktails, etc. Mr. Keller testified in his deposition that almost anything Mrs. Shunk or any of the other lady solicitors did in securing prospective customers was part of their jobs, for which they were paid. He stated they had no regular working hours, but worked all the time getting people to go on the plane trips, and then seeing that they woke up and got on the planes.
In his compensation order, the Judge of Industrial Claims found on the “evidence presented * * * as well as the candor and demeanor of the witnesses who testified * * * ”, that in the course and scope of her employment Mrs. Shunk accompanied Mr. Tanly to his apartment to ascertain his room number. The Judge of Industrial Claims accepted the testimony of the claimant as corroborated by Mr. Keller and other witnesses for the claimant, including Mrs. Catherine Morris, and found that the accident and injury arose out of and in the course of her employment and are compensable.
However, the Full Commission reversed, holding:
“We believe that the judge of industrial claims has erred in finding this claim compensable. We feel that the facts clearly show that the claimant had deviated from her employment prior to the accident. Surely it cannot be said that merely because the claimant was working in an area other than her home area, that she must be considered to be in her employment during an evening involving a late dinner and visits to cocktail lounges. Whatever motivation the claimant may have had for jumping from the window, we feel that the injury cannot be considered to have arisen out of and in the course of her employment.”
It is quite true that the particular circumstances related above present a suspicious inference that claimant was not acting in the course of her employment at the time of her injury; that there may have been a deviation by claimant from her employment, and that her presence in the apartment at the late hour may have been a social engagement of her own, rather than one required for the discharge of her employment duties. However, a suspicious inference in these particular circumstances is not necessarily conclusive. The nature of claimant’s employment, according to the testimony, involved solicitation, salesmanship and persuasion, and follow-up action to see that prospective customers were on scheduled flights to the development site, not dischargeable only during working hours normal to most employees. Consequently, it seems fairly well established that promotion of real estate sales to prospective customers of the kind here considered involves techniques and methods in a special class that have been found to be necessary in persuading prospective customers to agree to make the related plane trips.
In a debatable situation, such as this one, we conclude we should rest our judgment with the trier of the facts and lay aside our skepticism and natural inclination to be *272 cynically suspicious. We cannot divine from the record that the Judge of Industrial Claims was too trusting and credulous in accepting testimony favorable to claimant. See Bituminous Casualty Corp. v. Richardson, 148 Fla. 323, 4 So.2d 378; N & L Auto Parts Co. v. Doman (Fla.App.) Ill So.2d 270, cert, discharged (Fla.) 117 So.2d 410; Hardware Mutual Casualty Co. v. Sutton (Fla.) 197 So.2d 502. See 1 Larson, Workmen’s Compensation § 11.23 at 178; also 1 Larson, supra, at 136. See also Sims Tire Service, Inc. v. Parker, 146 Fla. 23, 200 So. 524; Crowell v. Messana Contractors (Fla.) 180 So.2d 329; Sun Insurance Co. v. Boyd (Fla.App.) 101 So.2d 419 and United States Casualty Co. v. Maryland Casualty Co. (Fla.) 55 So.2d 741.
The writ is granted; the Commission’s order of reversal is quashed with direction that the order of the Judge of Industrial Claims be reinstated.
It is so ordered.
DREW, THORNAL and BOYD, JJ., concur.
ROBERTS and ADKINS, JJ., and SPECTOR, District Court Judge, dissent.